## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **(Chapter 11)** |
| **GDC TECHNICS, LLC,** | § | |
| | § | **Case No. 21-50484-cag** |
| Debtor. | § | |

### UNITED STATES OF AMERICA EX. REL AHMED BASHIR'S
### RESPONSE TO DEBTOR'S OBJECTION TO CLAIM NO. 122

The United States of America, by way of Relator, Ahmed Bashir ("Relator"), by and

through the undersigned counsel, files this Response pursuant to Fed. R. Bankr. P. 3007 and LBR

9014(b) to the Objection to Claim No. 122 filed by GDC Technics, LLC (the "Debtor" or "GDC")

[Dkt. 366]. In further support of this Response, Relator respectfully represents as follows:

## I.    INTRODUCTION

1.      In its Objection to Claim No. 122 [Dkt. 366] (the "Objection"), GDC refers to the

Relator's *qui tam* action as "nothing more than sour grapes that [Relator's] company lost the . .

.Air Force One Projects."[1] This could not be further from the truth. In fact, Relator's company,

Emerald Aerospace, LLC ("Emerald"), did not even submit a bid on the VC-25B program. Relator

brought the *qui tam* action to seek justice for the United States taxpayer based on the major

irregularities and fraudulent conduct he observed in connection with the source selection process

on other Boeing projects—not to exact some personal revenge.

---

[1] Objection ¶ 18.

2.      GDC incorrectly argues in its Objection that Relator's Claim: (A) "fails to describe or otherwise identify anything about the Claim above the initial $56 million;[2] (B) is duplicative in its entirety to components of Boeing's claim;[3] and (C) lacks evidentiary support.[4]

3.      GDC's assertions lack support both under the facts and applicable law. As to GDC's first argument, the Relator's Claim clearly incorporated the additional damages set forth in the August 18, 2021 Addendum to Boeing's Claim [Claim No. 79]. As to GDC's second argument, Relator's Claim is not duplicative of Boeing's claim as it does not seek Boeing's damages on behalf of the United States government. Rather, Relator merely adopts Boeing's estimation of the bill footed by the United States taxpayers as a result of Boeing and GDC's fraud. As to GDC's third argument, GDC incorrectly asserts a higher pleading standard than that required under the Bankruptcy Rules.

4.      For the reasons set forth herein, Relator respectfully requests that the Bankruptcy Court reject GDC's arguments, deny the relief sought in the Objection, and allow Relator to proceed with the discovery he and the United States Government are entitled to fully adjudicate and liquidate the Claim.

## II.      BACKGROUND

### A.  The VC-25A and VC-25B Programs

5.      Boeing has prime contracts with the United States Government to perform maintenance and repair work on the existing Air Force One presidential aircraft under what Boeing and the United States Government refer to as the "VC-25A Program."[5]

---

[2] Objection ¶ 18.
[3] *Id.* ¶ 19.
[4] *Id.* ¶ 15.
[5] Objection of The Boeing Co. to Scheduled Claim of Mazav Mgmt. LLC and GDC Investco [Dkt. 320] (the "Boeing Objection") ¶ 7.

6.      In September 2015, the United States Congress authorized the VC-25B Program to begin the design, development, completion, certification, and delivery of the next generation of presidential aircraft that will replace the existing Air Force One fleet ("VC-25B Program").[6]

7.      On or about August 1, 2017, the U.S. Government purchased two undelivered 747-8 Intercontinental aircraft from Boeing.[7]  On February 20, 2018, former President Trump reached an informal agreement with Boeing's CEO to serve as the U.S. Government's prime contractor to complete the VC-25B Program for a firm-fixed price contract of $3.9 billion.[8] The Boeing 747-8 aircraft must be uniquely modified to provide the President and staff with safe and reliable transportation with an equivalent level of communications capability and security available in the White House.[9]

8.      Aircraft manufacturers such as Boeing and Airbus do not typically engineer, design, manufacture or install the interiors of the business jets they manufacture. Rather, Boeing manufactures and delivers their business jets "green," or with unfinished interiors. The aircraft can fly but is not finished, so the manufacturer (or sometimes the end customer) contracts with a completion center such as Greenpoint Technologies ("Greenpoint"), or L3 Harris ("L3") (to name a few) to design, engineer, manufacture, certify and install the entire interior of the aircraft.[10]

9.      Boeing's prime contracts with the U.S. Government for the VC-25B and VC-25A Programs are of critical importance to the U.S. Government and have been assigned a Defense

---

[6] *See* UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, *Defense Acquisitions: Assessments of Selected Weapon Programs* at p. 158 (Mar. 31, 2016), https://www.gao.gov/products/gao-16-329sp. The Court may take judicial notice of this publication. *Segura v. Gen. Motors LLC*, DR-14-CV-077-AM-VRG, 2015 WL 13805701, at *7 (W.D. Tex. July 29, 2015) ("The Fifth Circuit Court of Appeals has approved the practice of taking judicial notice of official Government websites"), *report and recommendation adopted*, DR:14-CV-0077-AM/VRG, 2015 WL 13805702 (W.D. Tex. Sept. 30, 2015).
[7] *See* Boeing Objection ¶ 7 [Dkt. 320].
[8] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl. ¶ 3.
[9] *See* Pl.'s App. for a TRO and Temporary Inj. at 3-4, *The Boeing Company v. GDC Technics LLC*, Cause No. 236-324551-21 in the 236th District Court of Tarrant County.
[10] Boeing Objection ¶ 8 [Dkt. 320].

Priorities and Allocations System ("DPAS") rating of "DX-A1" by the U.S. Department of Defense.[11] "DX"-rated programs are of the highest national defense urgency and are reserved for the most important and highest-priority defense projects within the U.S. Department of Defense.[12]

10. Building an aircraft with the technological, security, functional and aesthetic requirements of Air Force One is a significant undertaking and implicates major national security considerations.[13] It requires extensive planning and design, even before individual components are fabricated and installed.[14] The VC-25B Program is subject to a strict, tightly controlled, and carefully sequenced schedule, meaning that a delay in one aspect of the program can delay others that depend on its completion.[15]

### B. Boeing's Contractual Requirements, Representations, and Certifications

11. Any government contract has strict contractual, statutory, and regulatory requirements that must be met and certified before government funds are lawfully spent. Because the VC-25A and VC-25B Programs are top secret, DX-A1 high-priority programs, even more scrutiny is given to the source selection process. Strict adherence to the contractual requirements and compliance with the federal regulations is of utmost importance and must be certified in order to receive U.S. taxpayer funds.

12. Section 143 of the National Defense Authorization Act (Public Law 115-232) ("NDAA") mandates that contracts for logistics support in connection with the VC-25B Program

---

[11] Boeing Objection ¶ 7 [Dkt. 320]. Codified in 15 C.F.R. § 700, DPAS is a federal regulation designed to prioritize national defense-related contracts to support military, energy, homeland security, emergency preparedness, and critical infrastructure requirements. *Id.*

[12] *Id.* Ofthe thousands of United States Government contracts currently in existence, fewer than 20 are rated DX. Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl. at ¶ 5. *See* United States Department of Defense, *Updated DX-Rated Program Listing* (Nov. 13, 2018), available at https://www.dcma.mil/Portals/31/Documents/DPAS/DX_List_Nov_2018.pdf?ver=2019-05-07-095847-960.

[13] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl. at ¶ 10.

[14] *Id.*

[15] *Id.*

comply with 10 U.S.C. § 2304, regarding open competition for bidding. In essence, 10 U.S.C. § 2304 requires Boeing to represent and certify to the U.S. Government that the source selection process for the VC-25B Subcontracts is the result of full, fair, and open competition.[16]

13.     For example, 48 C.F.R. §§ 9.103 and 9.104-1 require government contractors/subcontractors to affirmatively represent and demonstrate that each has the following:

(a) "adequate financial resources to perform the contract, or the ability to obtain them";

(b) the ability to comply with the required delivery and performance schedule";

(c) "a satisfactory performance record";

(d) a "satisfactory record of integrity and business ethics";

(e) "the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them";

(f) "the necessary production, construction, and technical equipment and facilities, or the ability to obtain them"; and

(g) "be otherwise qualified and eligible to receive an award under applicable laws and regulations."

14.     Likewise, Boeing requires its subcontractors (here GDC) to certify that the representations made during the source selection process are truthful and meet the requirements set forth in 48 C.F.R. §§ 9.103 and 9.104-1 at the time of source selection, and throughout the performance of the subcontract.[17] In other words, by receiving progress payments in connection with the $3.9 billion VC-25B Program, GDC is representing and certifying *inter alia* that it is

---

[16] Boeing also represents to potential bidders on subcontracts for projects such as the VC-25A, VC-25B Programs, and other head of state projects that it will conduct the source selection process "fairly, impartially, and in an ethical and proper manner." *See* A014 Code of Conduct, The Boeing Corporation, https://www.boeingsuppliers.com/idscommon/clauses/AXXX/A014_8-31-04.pdf. *United States v. Flores*, 730 Fed App'x 216, 220 n.1 (5th Cir. 2018) ("Information obtained from online sources is becoming a frequently used basis for judicial notice. To this point, government and corporate websites . . . are among the most commonly relied upon sources.") (Haynes, J., concurring).

[17] *See generally* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl., Ex. B at 143.

financially solvent and meets the requirements of 48 C.F.R. §§ 9.103 and 9.104-1. It would be a false claim to seek or accept payment when the subcontractor knows that it does not comply with these mandatory federal regulations and contract requirements.

15.     There are also heightened standards, representations, and certifications that a government contractor/subcontractor must make and follow in connection with DX-A1 classified, high-priority projects (also known as "Rated Orders").[18] All government contractors/ subcontractors performing work on a Rated Order must, among other things, reject a contract if it knows or should know that it cannot meet the contractual completion deadline, schedule its operations so that the DX Rated Order is timely completed and prioritized over all other work and operation it has, and immediately notify the prime contractor and government if it cannot meet the mandatory deadlines.[19] Boeing's VC-25B Subcontracts also require the subcontractor to affirmatively represent and certify that the subcontractor can and will comply with all federal regulations related to acceptance and performance of a DX Rated Order (*i.e.*, 15 C.F.R. Part 700) at the time of the award, as well as each time the subcontractor seeks and obtains any progress payment under the VC-25B Subcontract.[20] It would be a false claim not to do so and to continue accepting payments from the U.S. Government in connection with Air Force One.

16.     Because GDC was ultimately owned and controlled by the Saudi Government, numerous other regulations and restrictions governed Boeing's ability to select GDC as the major subcontractor for Air Force One. For example, 10 U.S.C. § 2536, and Boeing's prime contract with the U.S. Government prohibit Boeing from awarding a national security subcontract where it

---

[18] A "Rated Order" is any prime contract, subcontract, or purchase order in support of a DPAS approved program issued in accordance with the provisions of 15 C.F.R. 700. It is undisputed that the VC-25A and VC-25B contracts and subcontracts are "Rated Orders" mandating strict compliance with 15 C.F.R. 700 and all DPAS Rules.
[19] 15 C.F.R. §§ 700.13-.15, .74-.75.
[20] *See generally* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl., Ex. B at 169.

is necessary to share classified information "to an entity controlled by a foreign government" without seeking and obtaining a waiver from the Secretary of Defense.[21] Boeing is also required to disclose if any of its subcontractors are foreign owned or controlled and obtain approval from the U.S. Department of Defense to use that subcontractor.[22] Boeing's Request for Information ("RFI") and Request for Proposal ("RFP") process as well as the VC-25B Subcontracts require the subcontractor to affirmatively represent and certify that the subcontractor can and will comply with all federal regulations and that it is not subject to foreign ownership, influence or control.[23] This is true at the time of the award, as well as each time the subcontractor seeks and obtains any progress payment under the VC-25B Subcontracts.

17.     The design, plans, engineering, and specifications for Air Force One implicate critical national security considerations.[24] Accordingly, Boeing was under heightened restrictions with respect to the selection of major subcontractors for the VC-25A and VC-25B Programs.[25] Boeing must certify compliance with these federal regulations as part of its prime contract with the U.S. Government. Boeing, along with all subcontractors, are required to represent and certify compliance with an approved Security Agreement (DD Form 441), that includes compliance with all provisions of the National Industrial Security Operating Manual ("NISPOM" or the "Manual").[26] The Manual establishes requirements, restrictions, and other safeguards for the protection of classified information disclosed to government contractors/subcontractors to prevent unlawful disclosure. Boeings subcontracts also require the subcontractor to represent and certify

---

[21] 48 C.F.R. § 252.209-7002.

[22] 48 C.F.R. § 252.209-7001.

[23] *See generally* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl., Ex. B at 171-72.

[24] *See* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet. ¶ 62.

[25] *See* 48 C.F.R. § 52.204-2. 48 C.F.R. § 52.204-2(b) requires all prime contractors (such as Boeing) to mandate the same security compliance standards and certifications from its subcontractors that will have access to classified information in connection with performing the government contract.

[26] *See* 32 C.F.R. Part 117.

United States of America ex rel. Ahmed Bashir's
Response to Debtor's Objection to Claim No. 122                                              Page 7

full compliance with all ITAR and Trade Control Laws at the time of acceptance, as well as all throughout the performance of the subcontract.[27]

18.     48 C.F.R. § 3.502-2 and 48 C.F.R. § 52.203-7(b), strictly prohibit any person from (1) providing, attempting to provide, or offering to provide any kickback; or (2) soliciting, accepting, or attempting to accept any kickback in connection with a government contract or subcontract. Additionally, 48 C.F.R. § 52.203-7(c)(2)-(3) provides that if Boeing or GDC "has reasonable grounds to believe that a violation described in paragraph (b) of this clause may have occurred, the Contractor shall promptly report in writing the possible violation. Such report shall be made to the inspector general of the contracting agency…or the Attorney General."

### C.  GDC's Ownership and Control by the Saudi Arabian Ministry of Finance

19.     In May 2013 the Saudi Ministry of Finance acquired Gore Design through a shell company it created called SAAV Completion Ltd ("SAAV").[28]  All capital used to acquire GDC and fund its ongoing operations ultimately came from the Saudi Government.  The Saudi Ministry of Finance acquired Gore Design to use as a vehicle for the completion of Head-of-State aircraft for the Kingdom of Saudi Arabia and the Royal family. GDC's current CEO has now admitted under oath that, ultimately, GDC was owned, controlled, and influenced by the Saudi Arabian Monarchy.[29]

---

[27] *See generally* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl., Ex. A at 96-97 & Ex. B at 171-72.
[28] Upon information and belief, SAAV stands for "Saudi Arabia Aviation." SAAV is a shell company formed by the Saudi Arabia Ministry of Finance and owned 80% of GDC. Objection of the Official Committee of Unsecured Creditors to Entry of Proposed Final Orders Authorizing Debtor's Use of Cash Collateral and Long-Term Postpetition Financing (the "UCC Objection") [Dkt. 200] ¶¶ 4-5. MAZ Aviation Consulting, a predecessor of MAZAV Management LLC ("MAZAV"), technically owned the other 20% of GDC but MAZ did not pay any part of the purchase price. Boeing Objection ¶ 9 [Dkt. 320]. Upon acquiring Gore Design, the Saudi Government changed the name of the company to GDC. Foreman Decl. ¶ 9 [Dkt. 33].
[29] UCC Objection, Ex. 1, Foreman Dep. 46:11-20 [Dkt. 200-1].

20.    From 2013 to February 2019, the Saudi Government owned and controlled GDC.[30] Technically, Mohammad Hamad A. Al Zeer ("MAZ") was the managing director of GDC but, ultimately, MAZ took direction from the Saudi Government. In fact, all five of GDC's board members were Saudi Arabian citizens, three board members were from the Saudi Ministry of Finance, and the Deputy of the Saudi Ministry of Finance served as GDC's Chairman, who performed all functions in that regard from Riyadh, Saudi Arabia.[31]

21.    Upon information and belief, GDC did not seek or receive approval from the Committee on Foreign Investment in the United States ("CFIUS"), the United States' inter-agency committee responsible for assessing the national security risks arising from foreign investment.[32]

22.    Soon after the acquisition, the Saudi Ministry of Finance contracted GDC to complete two of its Boeing 787-8 luxury "Dreamliner" aircraft (bearing serial numbers 40053 and 40059) (collectively, the "Saudis' 787-8 Aircraft").[33] The original contract price for the completion was approximately $100 million each and the original delivery date was in 2016.

23.    After the Saudis took ownership and control, GDC's sole focus was completing the Saudis' 787-8 Aircraft, as well as an additional Boeing 777ER aircraft inputted later in 2015 ("777ER Aircraft"). That remained the case until February 2019 when, as detailed below, the Saudis' 787-8 Aircraft were finally completed on February 8, 2019 (using U.S. taxpayer money) and the Saudis flew their aircraft to Riyadh, forfeited all interest in GDC, walked away from over

---

[30] *See* UCC Objection at ¶ 4 [Dkt. 200].
[31] *See id.* ¶ 18 [Dkt. 200].
[32] *See* 31 C.F.R. § 800 *et seq.*
[33] UCC Objection, Ex. 9 at 4-5 [Dkt. 200-9]. GDC also refers to the Saudis' 787-8 Aircraft in its financials as "638" and "639."

United States of America ex rel. Ahmed Bashir's
Response to Debtor's Objection to Claim No. 122                                          Page 9

$190 million in "loans," and left the company to be further pillaged by MAZ and other Saudi-Insiders (defined below).[34]

### D. GDC's Abysmal Financial Performance and Program Management

24.     GDC has been financially insolvent and grossly undercapitalized since the Saudi Government acquired it from Gore Design. From May 2013 until Boeing awarded the Air Force One Subcontracts (discussed below), GDC's only "revenue" came from the Saudi Government for the completion of the Saudis' 787-8 Aircraft and 777ER Aircraft.[35]

25.     From late 2013 through July 2016, the Saudi Ministry of Finance pumped over $150 million in additional "equity" infusions into GDC (over and above the contract prices) that went towards the completion of the Saudis' 787-8 Aircraft. As a result of MAZ's mismanagement, GDC was only negligibly closer to completing the Saudis' 787-8 Aircraft.

26.     At the end of July 2016, the Saudi Arabian Crown Prince Mohammed bin Salman ("MBS") instructed the Saudi Ministry of Finance to cease making "equity" infusions into GDC and, instead, mandated all future cash infusions to complete the Saudis' 787-8 Aircraft be booked as loans as opposed to equity. The "loans" immediately started racking up by the tens-of-millions.[36]

27.     On or about August 8, 2016, the Saudi Government injected $75 million as a "loan" to keep GDC alive to complete the Saudis' 787-8 and 777ER Aircraft.[37] Effectively, GDC was cash starved from the beginning and its entire existence was predicated on the Saudi Government's willingness to continue pumping money into GDC (or lack thereof).

---

[34] *See* UCC Objection ¶ 5 [Dkt. # 200], Ex. 1, Foreman Dep. at 46:6-47:4, & Ex. 9. After taking delivery of the Saudi's 787-8 Aircraft, and upon information and belief, the Saudi MoF forfeited and abandoned all interests in GDC to distance themselves as much as possible from the allegations and false claims alleged herein.
[35] *See* UCC Objection, Ex. 9 at 73 [Dkt. 200-9].
[36] UCC Objection, Ex. 9 at 25 [Dkt. 200-9].
[37] *Id.*

United States of America ex rel. Ahmed Bashir's
Response to Debtor's Objection to Claim No. 122                                   Page 10

28.     In August 2016, GDC's CFO was terminated due to GDC's abysmal financial performance, program management, and execution. GDC's poor financial and managerial performance deteriorated so much that in the Summer of 2017, the Saudi Ministry of Finance brought in auditors with Alvarez & Marsal to audit the books of the company, evaluate the future of the company and, more importantly, evaluate how the Saudis were finally going to get their 787-8 and 777ER Aircraft completed.

29.     By this time, the Saudi Government had injected over $600 million in GDC to complete the Saudis' 787-8 and 777ER Aircraft. According to another former CEO of GDC, Charlie Celli (GDC's third CEO in less than three years), the Alvarez & Marsal auditors were shocked that no one at GDC could account for where the $600 million went.

30.     By the fall of 2017, GDC was once again at the point where it could not make payroll or pay vendors.[38] If the Saudi Ministry of Finance did not infuse more cash, GDC would have to shut its doors by the end of November. If that would have happened, all work on the Saudis' 787-8 and 777ER Aircraft would stop and the Saudi Government would be left holding the bag on three uncompleted airplanes they had invested hundreds-of-millions in. So at the end of November 2017, the Saudi Ministry of Finance injected another $50 million into GDC.[39]

31.     Boeing and Jerry Dunmire ("Dunmire") knew all of this and would soon offer a temporary solution by awarding GDC another task order on the VC-25A Program and encouraging GDC to bid on the India Head Of State Project ("India HOS Project"), as well as the VC-25B Program. This would create liquidity for GDC and, in exchange, Boeing would be in a better position to secure a multi-billion joint venture with the Saudi Government (as discussed below).

---

[38] *See id.*
[39] *Id.*

32.     In December 2017, Dr. Fahad Al Humaidah, Advisor to the Saudi Ministry of Finance and GDC's Chairman of the Board, emailed GDC's entire Board mandating that "GDC is not to pursue any new business and not to accept any new business."[40] GDC's acting CEO, Richard Francey, and MAZ were copied on the email.[41] GDC's CEO relayed this mandate to Boeing through Dunmire, as well as the Saudis' mandate that GDC prioritize the completion of the Saudis' 787-8 and 777ER Aircraft at all costs.

33.     MAZ ignored the mandate and continued pursuing subcontracts from Boeing in connection with the Air Force One Subcontracts and the India HOS Project.

**E.  GDC Solicits United States Government Subcontracts and other Head-of-State Subcontracts from Boeing to create liquidity.**

34.     While GDC was attempting to complete the Saudis' 787-8 and 777ER Aircraft, GDC also started soliciting other completion work from Boeing to help fund ongoing operations. This included bidding on the India HOS Project, as well as additional task orders under the VC-25A Program.

35.     It is through the bidding process that Relator first became aware of numerous issues and irregularities with how Boeing conducted the bidding process on these projects, as well as the inexplicable result of GDC being awarded major government subcontracts despite GDC's foreign ownership and control; financial insolvency; and lack of engineering, design, and completion experience. This requires context.

36.     Dunmire was Boeing's Director and Program Manager responsible for the VC-25A Program out of Boeing's San Antonio facility. Dunmire oversaw all head-of-state aircraft for Boeing, which included both domestic (Presidential Fleet) and international head-of-state aircraft.

---

[40] This was confirmed by a former CEO of GDC, as well as another Advisor to the Saudi MoF.
[41] Dr. Fahad Al Humaidah is a formal government employee of the Kingdom of Saudi Arabia and ultimately took direction from MBS.

37.     Boeing performed work on the VC-25A Program at its Wichita, Kansas facility up until the end of 2014 when Boeing closed that facility and moved its operations for Air Force One to San Antonio, Texas. Upon doing so, Boeing immediately began having major issues finding sufficient qualified laborers who had the requisite security clearances to work on Air Force One – which is known as "Yankee White" security clearance. The process for a skilled and qualified employee to obtain a "Yankee White" security clearance can take several years.

38.     The RFI and RFP processes require potential subcontractors to provide information concerning, among other things: whether the subcontractor has any foreign ownership, investment, or control; the subcontractor's competencies, capabilities, and experience; government contract experience; the subcontractor's financial solvency and revenue history; and security clearances such as employees/contractors with Yankee White clearance. Additionally, all Boeing subcontracts on projects for the U.S. Government require all subcontractors (like GDC) to represent and certify compliance with all U.S. foreign export control regulations, laws, and restrictions; all NISPOM regulations, representations, and certifications; and all ITAR regulations and restrictions.[42]

39.     By mid-2015, Boeing had major problems finding qualified laborers for Air Force One so it began seeking subcontractors who had qualified "Yankee White" laborers who could perform the necessary work. It was during this time that MAZ and GDC began forming a *quid pro quo* relationship with Boeing and Dunmire. In 2015, Dunmire encouraged GDC to bid on the VC-25A Program which entailed cabinet and monument repair, refurbishment and reinstallation work. Boeing (through Dunmire) met with GDC's CEO at the time and told him what steps GDC had to take if it wanted to win the contract.

---

[42] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl., Ex. B at 142-43.

40.     Despite verbally representing to Emerald that it was the most qualified subcontractor to handle the new subcontract in connection with the VC-25A Program, Boeing (through Dunmire) awarded the subcontract to GDC. The VC-25A Subcontracts required GDC to repair and refurbish hundreds of interior components and monuments on Air Force One.[43] GDC was paid approximately $5-10 million per year under the new VC-25A subcontracts.[44]

41.     This occurred at the same time Boeing was actively soliciting numerous additional VIP BBJ 787-8 contracts and BBJ 777-300ER fleet modernization contracts from the Saudi Arabian government – the foreign government that ultimately owned and controlled GDC.[45] In other words, Boeing was doling out subcontracts on major U.S. defense projects to GDC at the same time Boeing was soliciting valuable contracts from GDC's beneficial owner – the Saudi Arabian government.

42.     In 2017 and 2018, Boeing continued offering and directing additional major subcontracts to GDC, including the subcontract to design, engineer, certify, and complete the new Air Force One aircraft, as well as the India HOS Project.[46] It was mainly through the source selection process on the India HOS Project where Relator witnessed and was exposed to the irregularities and improprieties in Boeing's source selection process, as well as the major national security implications from outsourcing the completion of Air Force One to an insolvent shell company owned and controlled by the Saudi Ministry of Finance whose sole concern was the completion of the Saudis' 787-8 and 777ER Aircraft.

---

[43] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl. ¶ 6.
[44] *See* UCC Objection, Ex. 9 at 73 [Dkt. 200-9].
[45] *See* September 30, 2016 offer letter from Boeing to the Kingdom of Saudi Arabia for two additional BBJ 747-8 aircraft and three BBJ 777-300ER aircraft.
[46] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] at 143.

43. It was an open secret between GDC and Boeing that GDC would have failed the requisite financial review and audit had Boeing and Dunmire required one – as they did for every other bidder on the VC-25B Program. So Boeing did not require GDC to submit audited financials in connection with bidding on the VC-25B Subcontracts (because GDC did not have them).[47] GDC's unaudited financials (produced in this Bankruptcy Proceeding), however, showed GDC had a net loss of over $17 million and $88 million in negative equity in 2017.[48] GDC booked a net loss of over $4.8 million and negative equity of over $92 million in 2018.[49]

44. In addition to Boeing's direct knowledge of GDC's financial insolvency discussed above, Section 23 of the VC-25B Subcontract requires GDC to provide Boeing with its financials on a quarterly basis so that GDC's financial condition can be audited throughout the performance of the Air Force One Subcontracts.[50] Thus, Boeing knew GDC was financially insolvent and that GDC's existence depended on the willingness of the Saudi Government to continue pumping money into GDC (to finish the Saudis' 787-8 and 777ER Aircraft).

45. According to GDC's former CEO, GDC could not obtain a performance bond and could not obtain financing to secure the required performance bond due to GDC's poor credit rating. MAZ suggested having the Saudi Ministry of Finance issue a performance guarantee instead. Boeing declined because Boeing's senior management would never collect on the guarantee due to the importance of the Kingdom of Saudi Arabia's business to the overall financial success of Boeing. Instead, Boeing ignored this requirement and concealed these facts from the U.S. Government in violation of Section AA02 of the Contract and 48 C.F.R. § 28.102-2.[51]

---

[47] *See* UCC Objection, Ex. 1, Foreman Dep. 61:1-62:3 [Dkt. 200-1].
[48] *See* UCC Objection, Ex. 9 at 75.
[49] *See* UCC Objection, Ex. 9 at 75.
[50] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] at 136.
[51] This is also a breach of Section AA02 of the Contract. Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1], Ex. A, Pet., Ex. 1 at 36.

46.     Because GDC's financials showed GDC to be insolvent, GDC falsely claimed to have two major contracts that GDC claimed would secure its financial solvency going forward. Neither contract was legitimate, and Boeing knew it because the purported contracts also involved Boeing.

47.     The first contract GDC listed was for the interior VVIP completion of a Boeing 787 aircraft that Saudi Prince Saud Bin Nayef Al-Saud was looking to purchase from Boeing in 2016. GDC claimed it received a $5 million deposit and that the completion contract would provide substantial liquidity to GDC. By the fall of 2017 (prior to GDC's bid submission on the VC-25B Subcontracts), however, Prince Saud had already canceled the purchase contract with Boeing and the completion contract with GDC.[52] In other words, GDC knew this alleged "contract" was not a legitimate source of future revenue at the time GDC bid on the VC-25B Program.

48.     The second contract GDC represented it had in the pipeline was for the interior completion of nine 787 commercial aircraft Saudi Arabian Airlines purchased from Boeing. In December 2016, MAZ began publicly claiming to have landed the interior completion contracts for these nine 787 aircraft. GDC represented this alleged contract would satisfy the financial review required to be awarded the VC-25B Subcontracts.

49.     In June 2017, Saudi Arabian Airlines, however, contracted with Boeing for the standard airline interiors. This occurred prior to awarding GDC the VC-25B Subcontracts. Thus, both GDC and Boeing knew these representations were false prior to awarding GDC the VC-25B Subcontract in April 2018.

---

[52] According to a former CEO of GDC, MAZ personally kept the $5 million deposit, was sued in the Kingdom of Saudi Arabia for the return of the deposit, and there is currently a judgment against MAZ for same.

**F.  GDC's False Representations, Certifications and claims for payment under the Air Force One Subcontracts.**

50.     There can be no doubt that GDC was owned and controlled by the Saudi Ministry of Finance and that Boeing knew it. Boeing requires all subcontractors to disclose any foreign ownership and control in connection with the RFI and RFP process.[53] GDC failed to disclose such interests because it would legally disqualify it from receiving the VC-25B Subcontracts.

51.     Boeing and GDC concealed GDC's foreign ownership and control from the U.S. Government at the time the Air Force One Subcontracts were awarded, as well as each time payments were released in connection with the VC-25B Program. Federal regulations, Boeing's prime contract with the U.S. Government, as well as Boeing's subcontract with GDC, prohibit subcontracting national security contracts to an entity that is controlled by a foreign government. Yet, that is exactly what Boeing and GDC did.

52.     Additionally, GDC is prohibited by federal law from releasing or disclosing top-secret, classified, ITAR controlled information to a foreign interest or foreign national.  For example, MAZ, as a foreign national, is not permitted to receive SSI or ITAR controlled information, nor is he allowed to attend certain briefings related to the work on DX-A1, top-secret projects for the U.S. Government.[54]

53.     On or about March 5, 2018, GDC's then CEO, Richard Francey, acknowledged that MAZ was given access to the top-secret specifications, engineering plans, and design drawings for the next generation Air Force One (all of which is restricted ITAR controlled information).[55] The unlawful disclosure of this top-secret information is a major breach of national security. A former

---

[53] *See* Boeing's Supplier Profile Information, Boeing Enterprise Supplier Tool.
[54] The prime contractor, Boeing, could also face consequences. *See* Department of Homeland Security Management Directive 11056.1; *see also* 32 C.F.R.§ 154.16(c)(1) (stating that non-U.S. citizens are not eligible for security clearances).
[55] This was also confirmed and reported by another former GDC CEO in the Fall of 2017.

GDC executive was immediately terminated by MAZ once MAZ discovered this was known to him. The former executive was so disturbed by this, he contemporaneously documented this serious breach of national security.

54.    This is supported by another former GDC CEO who worked closely with MAZ since 2007. This individual expressed serious concerns that SSI and ITAR controlled information was being funneled to MAZ through MAZ's confidants, Justin Utz and Tim Bartlett, during offsite meetings with Dunmire. This same former CEO also now acknowledges there was no way GDC could have passed the requisite financial audit without the concerted effort of Dunmire running interference for GDC.

55.    Upon information and belief, despite not having an ITAR export license from the United States Department of State, MAZ has access to SSI and ITAR controlled materials related to the VC-25B Program at anytime from anywhere in the world. This is a ***per se*** violation of the NISPOM regulations, including those set forth above, violations of ITAR regulations, and poses serious national security concerns.

56.    Upon information and belief, GDC did not seek or obtain an SSA or SCA to perform a DX-A1 rated contract. Despite the contractual and regulatory prohibitions against allowing foreign nationals access to, or involvement in, classified and top-secret DX-A1 contracts, GDC and MAZ were in violation of these strict regulations and restrictions. And although Boeing knew these facts to be true, both Boeing and GDC knowingly and intentionally hid it from the U.S. government not only at the source selection stage, but each time they sought and obtain payment of U.S. taxpayer funds. In doing so, and upon information and belief, Boeing and GDC exposed sensitive National Command Authority information to a Saudi foreign national and, likely, the Saudi Arabian Government.

57.     GDC also knowingly violated federal law and its contractual requirements by prioritizing the completion of the Saudis' 787-8 Aircraft and 777ER Aircraft to the detriment of performing the Air Force One Subcontracts. As stated above, both federal law and the Air Force One Subcontracts prohibit acceptance of a DX-A1 Rated Order if one knows or should know it cannot be timely fulfilled or prioritizing other projects to the detriment of a DX-A1 Rated Order. *See* 15 C.F.R. §§ 700.13(b)(1) and (14).

58.     Moreover, the Saudi Government's last cash infusion into GDC was in November 2017.[56] GDC did not finish the completion of the Saudis' 787-8 Aircraft until February 8, 2019 (fifteen months later). During those fifteen months, the vast majority of cash coming into GDC ultimately came from the U.S. taxpayers in connection with the Air Force One Subcontracts. Upon information and belief, GDC accessed and used U.S. taxpayer funds to go towards the completion of the Saudis' 787-8 and 777ER Aircraft. A former CEO of GDC described the situation as a Ponzi Scheme where GDC was always chasing new projects to catch up on older mismanaged projects.

59.     GDC also made material misrepresentations on its RFP submission by falsely claiming it had the requisite FAA Organizational Delegation Authority ("ODA") to perform the VC-25B Subcontracts. An ODA is what gives a company the authority to self-certify the interior components of the aircraft. GDC's previous ODA authority was revoked by the FAA in 2015 for lack of compliance. Thus, GDC could not perform the work required for this DX-A1 Program in the first place. Boeing knew GDC did not have the requisite ODA authority and knew that it would be a false claim to certify compliance with 15 C.F.R. Part 700 and the DPAS regulations without it.

---

[56] See UCC Objection at Ex. 9 p. 25 of 65.

60.     On or about April 20, 2018, Boeing shockingly awarded the VC-25B Subcontracts to GDC despite knowing that GDC was (1) owned and controlled by a foreign government; (2) financially insolvent; (3) incapable of obtaining a financial performance bond; (4) did not have the requisite ODA to perform the work; (5) had very limited engineering capabilities and capacity; (6) had never completed a VVIP or Head-of-State aircraft from start to finish; (7) had never worked on a Boeing 747 aircraft; and (8) was instructed to prioritize the completion of the Saudi's 787-8 Aircraft over any other project in violation of 15 C.F.R. 700 and DPAS Rules for the DX-A1 Rated Order.

61.     Boeing subsequently sued GDC for these very failures and now acknowledges that GDC's insolvency rendered GDC incapable of performing its obligations under the Air Force One Subcontracts – facts Boeing undeniably knew but failed to disclose to the U.S. Government.[57]

62.     Boeing had several other more viable and qualified bidders on the VC-25B Program. Two of the other competitors for the VC-25B Subcontracts were Greenpoint and L3. Both companies were financially solvent and have a long history of performing and delivering reliable and high-quality work on VVIP and Head-of-State aircraft. Indeed, Greenpoint and L3 have over three decades of experience designing, engineering, and completing VIP and VVIP aircraft. Both Greenpoint and L3 have full in-house design and engineering capability for Head-of-State aircraft interior completions and have successfully delivered multiple Boeing 747 and Heads-of-State aircraft.

63.     Both Greenpoint and L3 were in compliance with the federal regulations and contractual requirements concerning foreign ownership status, financial solvency, and necessary

---

[57] *See* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1], Ex. A, Pet. ¶¶ 28, 39, 67(f); Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] ¶¶ 28 ("GDC was required to 'obtain a Performance Bond in the amount of the full purchase contract value' to ensure performance of GDC's work on the VC-25B Subcontracts"); *id.*, Ex. A, Pet. ¶¶ 28, 39, 67(f); *id.* Ex. C, Roni Decl. ¶¶ 16-20.

security clearances to receive classified and top-secret information. Greenpoint and L3 also had the capacity to timely handle and prioritize the work in accordance with all requirements for a DX-A1 Rated Order. Greenpoint's and L3's bids on the VC-25B Subcontracts were competitively priced compared to GDC's bid. Which begs the question, why GDC?

### G.  Boeing's motives and incentives for outsourcing the next Air Force One GDC

64.     The objective absurdity of Boeing's decision to outsource the design, engineering, certification, and completion of Air Force One to an insolvent shell company owned and controlled by a foreign government that has never even worked on a Boeing 747 aircraft raises serious questions and concerns of national security and integrity.

65.     Initially, and upon information and belief, Boeing ignored GDC's disqualifying factors and the clear improprieties in the bidding process to curry favor with the Kingdom of Saudi Arabia. The Kingdom of Saudi Arabia is Boeing's second largest customer in the World for military defense and arms products.

66.     On March 23, 2018, MBS made a secret visit to Boeing and met with Boeing's top executives.[58]

67.     On March 30, 2018, **Boeing and Saudi Arabia publicly announce a $22 billion joint venture between Boeing and Saudi Arabia**.[59]

68.     On or about March 30, 2018, Boeing awards the India HOS Project to GDC.

69.     On April 20, 2018, Boeing awards GDC the Air Force One Subcontracts valued in the hundreds-of-millions of dollars.

---

[58] Dominic Gates, *Saudi Crown Prince Tours Boeing on Secretive Seattle Visit*, THE SEATTLE TIMES (MAR. 31, 2018, 10:24 PM), https://www.seattletimes.com/business/boeing-aerospace/saudi-crown-prince-tours-boeing-on-secretive-seattle.

[59] *See* THE BOEING COMPANY, Saudi Arabian Military Industries and Boeing Form Joint Venture Partnership Targeting 55% Localization, (Mar. 30, 2018), https://www.boeing.com/features/2018/03/saudi-boeing-joint-venture-03-30.page.

### H.  February 2019 Transaction and the Subsequent Looting of GDC's Remains

70.     On February 8, 2019, GDC finally completed the Saudis' 787-8 Aircraft and the true beneficial owners and controllers of GDC flew their aircraft from Fort Worth, Texas back to Riyadh.



71.     Immediately following GDC's delivery of Saudis' 787-8 Aircraft, the Saudi Ministry of Finance completely abandoned and forfeited all ownership interest and affiliation with GDC – and walked away from approximately $193 million in "loans" to the company.[60] This left a vacuum of GDC's ownership quickly filled by MAZ and other insiders. Indeed, after the Saudi Ministry of Finance forfeited its ownership of GDC, MAZAV became the 100% owner of GDC (the "February 2019 Transaction").[61]

---

[60] *See* Foreman Decl. ¶ 10 [Dkt. 33]. The current CEO of GDC could not say why the Saudi MoF suddenly decided to forfeit and abandon their interest in the company and walk away from over $193 million. UCC Objection, Ex. 1, Foreman Dep. 46:6-47:1 [Dkt. 200-1].

[61] A graphic depiction of the 2019 Transaction is included in the Declaration of Brad Foreman in Support of First Day Pleadings [Dkt. 33 ¶ 13].

72.     As the Bankruptcy Court is well aware, and as stated by both Boeing and the Unsecured Creditors Committee in pleadings before the Bankruptcy Court, GDC's insiders began looting the company's remains following the February 2019 Transaction.[62] Despite GDC's difficulty paying its employees and vendors, between April and September 2020, GDC paid $11.7 million to its Saudi-Insiders – **all while purporting to perform one of the highest priority, top-secret, self-defense projects of the United States Government – Air Force One**.[63] These are fraudulent transfers of United States taxpayer funds in disguise.

73.     GDC exhibited massive performance problems with the VC-25B Subcontract from the very beginning. Boeing and GDC immediately knew they had a major problem on their hands and had a conscious decision to make: disclose to the United States Government that Boeing selected a subcontractor for Air Force One that was owned and controlled by a foreign government; was financially insolvent; was incapable of fulfilling the requirements of the DX-A1 rated program, and woefully behind schedule. Or, remain silent and keep collecting progress payments from the United States Government under the VC-25B Program.  They chose the latter.

74.     On April 7, 2021, when Boeing could no longer hide GDC's insolvency and production delays, Boeing terminated the Air Force One Subcontracts and sued GDC in the Texas State Court Action.[64]  Specifically, Boeing acknowledge that GDC's financial insolvency "rendered GDC incapable of performing its obligations under the Subcontracts."[65] Boeing also initially admitted in multiple pleadings in both the Texas State Court Lawsuit, as well as in the pleadings before this Court, the following:

---

[62] UCC Objection ¶¶ 18-29 [Dkt. 200]; Boeing Objection ¶ 27 [Dkt. 320].
[63] UCC Objection ¶ 17 [Dkt. 200]; *see also* Schedules and Statement, Statement of Financial Affairs at § 6.1 [Dkt. 303]; *see also* Boeing Objection ¶ 26 [Dkt. 320].
[64] *See* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet.
[65] *Id.* ¶ 68.

➤ GDC was an incapable subcontractor for both the VC-25B and VC-25A Programs;[66]

➤ "GDC continually failed to meet its obligations to Boeing under the VC-25B Subcontracts;"[67]

➤ GDC "had no schedule sufficient to manage its work, could not meet required deadlines, and proved incapable of performing aspects of the program required by the VC-25B Subcontracts and the Statement of Work for designing and completing the interior aircraft systems and components";[68]

➤ "GDC failed to meet schedule requirements and proved unable to implement planning and a means of measuring progress";[69]

➤ "At no time during the project did GDC maintain a schedule which accurately planned and managed its performance, despite its contractual obligation to do so. GDC did not create an Integrated Master Schedule acceptable for the project as required by the VC-25B Subcontracts. GDC also failed to submit adequate progress metrics and reports to track its work and confirm completion of specific tasks";[70]

➤ "GDC repeatedly failed to timely release design drawings for integration into Boeing's system, and failed to provide information demonstrating its plans for complying with aircraft interior system requirements";[71]

➤ GDC's work on Air Force One "consistently failed to meet requirements and specifications" and will require substantial rework and re-procurement costs in excess of $300 million;[72]

➤ GDC was "severely undercapitalized, indebted, and incapable of securing any outside financing, dooming its business to failure";[73]

➤ "GDC never had remotely enough capital to engage in its core business";[74]

---

[66] *See id.* ¶ 2.

[67] *See id.* ¶ 29.

[68] *See* Addendum to Boeing's Proof of Claim against GDC [Claim #79-1] at ¶ 5, Ex. C., Roni Decl. ¶ 15.

[69] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet. ¶ 2.

[70] *Id.* ¶ 30.

[71] *Id.* ¶ 31.

[72] *Id.*; *see also* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] at ¶ 5 ("[GDC] had no schedule sufficient to manage its work, could not meet required deadlines, and proved incapable of performing aspects of the program . . . .").

[73] *See* Boeing Objection ¶¶ 18, 20 [Dkt. 320]; Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] at ¶ 6, Ex. C., Roni Decl. ¶ 16 (Boeing claims to have learned about GDC's "severe financial distress" in September 2020. But, as more fully set forth herein, Boeing actually knew of GDC's severe financial distress from the beginning); *see also* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet. ¶ 48.

[74] Boeing Objection ¶ 20 [Dkt. 320]; *See* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet. ¶ 2.

➢ "GDC could not obtain a performance bond to guarantee satisfactory completion of its work, as required by the VC-25B Subcontracts" and "GDC's many performance failures have been compounded by its financial troubles";[75]

➢ "GDC did not properly manage its suppliers" and "failed to employ or hire sufficient personnel to perform its work timely and in compliance with all requirements and standards, as required under the VC-25B Subcontracts."[76]

➢ GDC used funds from the VC-25B and VC-25A Programs (i.e. taxpayer money) to pay down "loans" to its Saudi Insiders, including entities owned and controlled by MAZ;[77]

➢ "As a result of GDC's failures, GDC missed numerous deadlines and delivery dates, caused myriad disruptions to the VC-25B program, and made insufficient progress on the aircraft interior work that it was required to perform. [As of April 2021], GDC [was] roughly one year behind schedule in meeting its contractual obligations;"[78]

➢ "GDC's failures have resulted in millions of dollars in damages" (over $300 million according to Boeing) and have "jeopardize[d] work that is of critical importance to the USAF and the President of the United States;"[79]

75.     Boeing also now admits that the selection of GDC to complete Air Force One has "caused significant disruption and delay,"[80] "is a threat to national security and has caused the U.S. Government immediate and irreparable harm."[81]

## I.   GDC Files for Bankruptcy and Continued to Hide Its Misdeeds

76.     On April 26, 2021, GDC filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the Western District of Texas, Cause No. 21-50484 (the "Bankruptcy Proceeding").[82]

77.     In a situation where the fox was truly guarding the hen house, after GDC initiated the Bankruptcy Proceeding, the Saudi-Insiders exercised exclusive dominion and control of GDC

---

[75] *See* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet. ¶¶ 38-39.
[76] *See* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet. ¶¶ 32, 34.
[77] *See* Boeing Objection ¶ 22 [Dkt. 320].
[78] *See* Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. B, Pet. ¶ 35.
[79] *See id.* ¶¶ 3, 37.
[80] *See id.* ¶ 69.
[81] *See id.* ¶ 89.
[82] Voluntary Pet. For Non-Individuals Filing for Bankr. [Dkt. 1].

United States of America ex rel. Ahmed Bashir's
Response to Debtor's Objection to Claim No. 122                                    Page 25

and sought to orchestrate broad global releases of themselves to further conceal their fraudulent conduct and avoid liability for the harm they inflicted.[83]

78.    As Boeing described it in its Objection, "by virtue of their control of [GDC], and despite contributing substantially to [GDC's] insolvency (if not precipitating it), the Owner Lenders have attempted to use [the] bankruptcy case to commandeer [GDC's] remaining assets and eliminate potential claims against themselves."[84] The Unsecured Creditor's Committee accurately described GDC, MAZ, and the Saudi-Insider's egregious conduct after the Saudi MoF abandoned GDC as follows:

> This is a case about a group of insiders that took over an insolvent company in a leveraged buyout, grossly undercapitalized it, and proceeded to drain it to the dregs…. Those same insiders, who still control [GDC], now seek to arrogate to themselves whatever value remains in [GDC], while shielding themselves from any liability or accountability.[85]

79.    That is precisely what happened here. But what has gotten lost in the Bankruptcy Proceeding is the fact that Boeing and GDC's knowingly false representations and certification of compliance with numerous contractual requirements and federal regulations (set forth above) is the very reason this happened in the first place – a consequence Relator/Emerald warned of in its Ethics Complaint to Boeing back in April 2018.

80.    On August 18, 2021, Relator filed its Proof of Claim, which summarize the factual and legal allegations made herein.[86] On August 26, 2021, GDC and Boeing surprisingly announced a proposed settlement that essentially resulted in Boeing fully releasing GDC from its conduct,

---

[83] UCC Objection ¶¶ 18-29 [Dkt. 200].
[84] *See* Boeing Objection ¶ 36 [Dkt. 320].
[85] UCC Objection ¶ 1 [Dkt. 200].
[86] Relator's Claim [Claim No. 122].

ignoring the fraudulent transfers to GDC's insiders, and walking away from damages in excess of $300 million.[87]

### J. Damage to United States Government

81.     Each time GDC requested or received a progress payment from Boeing in connection with the Air Force One Subcontracts, it did so knowing that material Federal statutes, regulations, and contractual requirements under the prime contract and Subcontracts were being violated. According to GDC's unaudited financials, Boeing paid (taxpayer money) to GDC over $12,768,685 in connection with the Air Force One Subcontracts in 2018, another $128 million in 2019, and an additional $89 million in the first quarter of 2020.[88] GDC has already been paid more than half of the contract price which amounts to over $105 million.[89]

82.     These damages are a direct result of the knowingly false representations and certification made by GDC.

83.     Moreover, Boeing's Proof of Claim in the Bankruptcy Proceeding further articulates the nature and extent of some of the damages caused by Boeing decision to outsource the completion of Air Force One to an insolvent shell company owned and controlled by the Kingdom of Saudi Arabia. Boeing acknowledges that GDC's financial insolvency conservatively resulted in damages exceeding $300 million.[90] According to Boeing, the largest aspect of this claim is due to "Re-Procurement" of another subcontractor which Boeing estimates to be over $238 million.[91]

---

[87] *See* Debtor's Expedite Mot. To Approve Global Compromise, Ex. B [Dkt. 373].
[88] *See* UCC Objection, Ex. 9 at 73[Dkt. # 200-9].
[89] Addendum to Proof of Claim of the Boeing Company [Claim No. 79-1] Ex. C, Roni Decl. at ⁋ 9.
[90] Addendum to Proof of Claim of the Boeing Company ¶ 9 [Claim No. 79-1].
[91] Addendum to Amendment to Proof of Claim of the Boeing Company, Ex. A [Claim No. 79].

84.    Boeing has already admitted to Congress that their decision to outsource the completion of Air Force One to GDC is going to result in at least a twelve-month delay in delivering the next generation Air Force One Aircraft and will cost at least an additional $500 million as a result (which will be borne by the taxpayers).

85.    As Congress has now discerned, and Boeing has now agreed, GDC's insolvency has resulted in at least one additional maintenance cycle for the existing Air Force One aircraft (*i.e.*, the VC-25A Program). Pursuant to the Department of the Air Force Fiscal Year 2022 Budget Estimates, the additional funding requirement from the U.S. taxpayer for the VC-25A program due Boeing and GDC's illicit collusion and failure to perform is at least $117,813,000.[92]

## III.    RESPONSE TO THE OBJECTIONS

86.    A claim objection proceeding is a contested matter governed by Bankruptcy Rule 9014. *See* Fed. R. Bankr. P. 3007 (advisory comm. notes).  Accordingly, Relator is entitled to discovery pursuant to Bankruptcy Rules 7025, 7026, and 7028-7037.  Relator intends to propound discovery regarding the matters set forth in Section II above.  Where, as here, "a timely response to the objection is filed, a hearing on the objection will be set pursuant to FRBP 3007."  L. Bankr. Rule 3007(a).  At the hearing hereon, following a fulsome discovery process, Relator can and will prove up all its allegations and damages.

### A.  Relator Described its Calculation of the Claim

87.    In its omnibus objection, GDC objects to the amount of the Claim, arguing that "the Claim fails to describe or otherwise identify anything about the Claim above the initial $56 million."[93] This is incorrect for two reasons. First, Relator clearly cited Boeing's amended claim

---

[92] *See* DEP'T OF THE AIR FORCE, Fiscal Year (FY) 2022 Budget Estimates at 165, (May 2021). https://www.saffm.hq.af.mil/Portals/84/documents/FY22/OM_/FY22PB%20Volume%20I%20-%20AF%20-%20FINAL%20to%20PRINT.pdf?ver=nG3_2x9uiQDjsAIpjP1DEQ%3d%3d.
[93] Objection ¶ 18.

filed on August 18, 2021 in support of the $312 million claim. Second, Boeing's amended claim makes clear the portion of its claim that is tied to GDC's non-performance on the Air Force One Projects as opposed to the India HOS Project. The portion of Boeing's amended claim tied to the Air Force One Projects is approximately $312 million and that is solely related to the minimum amount of damage Boeing itself claims arises from the unlawful selection of GDC as the subcontractor for Air Force One. Indeed, Boeing has told the United States Congress that the damages resulting from the selection of GDC are over $500 million. All of these damages (the amounts of which are provided by Boeing) are a direct result of the false claims against GDC. For this reason, the Bankruptcy Court should overrule GDC's omnibus objection.

## B. GDC's Specific Objections Miss the Mark

88. GDC also asserts specific objections for several portions of Boeing's Claim: (1) the T&M Contract Claim; (2) the FSD and Lower Lobe Design Claim; (3) the GDC-Driven Changes Claim; (4) the Other Boeing Work Claim; (5) the Accelerated Payment Claim; (6) the Prepetition Loan Claim; and (7) the Supplier Payment Claim (collectively, the "Objected-to Claims"). Notably, GDC does not object to (1) the Liquidation Payments Claim; (2) the Unpaid BGS Invoice Claim; (3) Undisputed Unpaid BDSI Invoices Claim; (4) the Undisputed Unpaid BDI Invoices Claim; (5) the Re-Procurement Claim; or (6) the Replacement Parts Claim (collectively, the "Unobjected-to Claims"). Accordingly, the Unobjected-to Claims should be deemed admitted. As stated above, the Re-Procurement Claim itself is in the hundreds-of-millions of dollars and directly arises out of the very basis of Relator's Claim – *i.e.*, the unlawful selection of GDC in the first place.

89.     For the Objected-to Claims, GDC objects on the basis that (i) Relator's Claim is duplicative of Boeing's Claim; and/or (ii) that Relator has not provided evidence in support of the Claim. Both arguments miss the mark.

###     i.     Relator's Claim is Not Duplicative of Boeing's claims

90.     GDC argues that Relator's Claim should be disallowed because it is a duplicate of Boeing's Claim, and that the Objected-to Claims cannot constitute amounts paid by the U.S. Government through the prime contract with Boeing. GDC is wrong for two reasons.

91.     First, the Claim is not duplicative of Boeing's Claim. Whatever legal or equitable claims Boeing may have against GDC are immaterial to the United States Government. The critical distinction is that the government, by way of the Relator, is pursuing a separate claim against GDC under the False Claims Act. By way of this objection, GDC would have the Bankruptcy Court erroneously conflate Boeing's breach of contract claims with the government's claim for fraud merely because Boeing's judicial admissions as to GDC's conduct (prior to essentially walking away from them) also further support Relator's Claim. Stated differently, the allegations in Boeing Proof of Claim prove up the very consequences Relator warned about when he filed his Ethics Complaint and brought these concerns to the attention of the Department of Justice.

92.     Second, the United States Government's damages are not simply the sum paid by it to Boeing through the prime contract. Violators of the False Claim Act can also be subject to replacement costs in *qui tam* cases.[94] The Supreme Court of the United States has said that the government's actual damages are measured as "equal to the difference between the market value of the [goods] it received and retained and the market value that the [goods] would have had if

---

[94] *See generally United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); *U.S. ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 648 (6th Cir. 2002).

they had been of the specified quality."[95] Boeing's proof of claim gives the Bankruptcy Court some idea of the government's actual damage resulting from the fraud.

93.     Because the Claim merely uses Boeing's estimation of damages as an approximate figure of the damage to the United States government resulting from GDC and Boeing's false certifications, the Claim is not duplicative, and this objection should be overruled.

### ii.     The Claim has *Prima Facie* Validity

94.     GDC argues the Claim should be disallowed because "it vehemently disputes the allegations" and Relator has not provided supporting documents for his Claim.[96] GDC's objection that the Claim should be disallowed for lack of detail, evidence, or supporting documentation must be overruled – where the Claim sets forth specific bases for liability and damages as here, the first grounds of objection is merely a "[g]eneral denial[] regarding the accuracy of the claim without specific contentions regarding the disputed items," which, pursuant to L. Bankr. Rule 3007, is a basis for denial of the Objection. *See* L. Bankr. Rule 3007(b).

95.     This Court has succinctly stated the universe of requirements of a prima facie valid claim:

> A 'proof of claim' is a written statement setting forth a creditor's claim and must conform substantially to the appropriate Official Form …. [A] creditor desiring to receive distributions in a bankruptcy case must file at timely proof of claim.  If the proof of claim is timely filed with the court and is in the Official Form 10 … the basic requirements for a proof of claim under Bankruptcy Rule 3001 will be satisfied…. Bankruptcy Rule 3001(f) provides that a proof of claim filed in accordance with these rules shall constitute prima facie evidence of the validity and the amount of the claim.[97]

96.     The Claim is entitled to *prima facie* validity because it wholly and fully complies with the requirements set forth above.  The Debtor's argument that it disputes the allegations, that

---

[95] *Bornstein*, 423 U.S. 316 & n. 13.
[96] Objection ¶¶ 18-30.
[97] *In re Reyna*, 08-10049-CAG, 2008 WL 2961973, at *2 (Bankr. W.D. Tex. July 28, 2008).

no evidence has been produced, and that Relator fails to describe its claim (in addition to being clearly wrong), simply is not a basis for disallowance of a *prima facie* valid claim.

97.     Rather, a contested matter has been initiated and the matter will be tried under the subset of rules applicable to claims objections pursuant to Bankruptcy Rule 9014.  The Objection appears to impose on Relator the unreasonable burden of establishing, *in a proof of claim*, all those items which would be the subject of a hearing or adversary proceeding following adequate discovery and motion practice. The Debtor does not get to shortcut the claims objection process and eliminate due process by simply stating that Relator has not marshaled its evidence in its proof of claim.  That is simply not the law – nor should it be because such an interpretation would eviscerate the fundamental rights of litigants to have their case fairly adjudicated.

98.     The Debtor's demand for a proof of claim to include writings or "evidence" is also wholly inconsistent with the law.  The "writings" requirement is applicable only to Bankruptcy Rule 3001(c) claims "based on a writing," courts look to the substantive state law to determine whether the claim is based on a writing.[98]  Here, the Claim is based on false claims and fraudulent misrepresentations to the United States Government.[99]  Rule 3001(c) simply does not apply.

99.     In conclusion, the Claim has *prima facie* validity and the burden rests on the Debtor to "produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."[100]  The Objection clearly fails to do so.

---

[98] *eCast Settlemetn Corp. v. Tran (In re Tran)*, 369 B.R. 312, 316 (S.D. Tex. 2007).

[99] *See U.S. ex rel Smith v. Boeing Co.,* 505 F.Supp.2d 974, (D. Kan. 2007) ("it is well settled that the False Claims Act gives the United States a cause of action against a subcontractor who *causes* a prime contractor to submit a false claim to the Government. Liability under the FCA thus does not necessarily require proof that the subcontractor submitted false claims to the prime contractor, if the subcontractor caused the presentation of false claims by the prime contractor.") (emphasis original).

[100] *Id.* (quoting *In re Armstrong*, 320 B.R. 97, 104 (Bankr. N.D. Tex. 2005).

100. For argument's sake, even if the Claim can be argued to lack sufficient documentation to comply with Bankruptcy Rule 3001 or the Official Form, "incomplete or insufficient proofs of claim are not *prima facie* valid, they are not automatically disallowed."[101] Rather, "the claimant must, in response to a substantive objection, present sufficient evidence of the claim's validity and amount."[102] Even if Rule 3001(c) were to apply, then, the burden is shifted to the creditor "to prove the validity, ownership, and amount of their claims in the same manner as if they were suing the debtors in state court."[103]

101. In addition to the substance of this Response, Relator is entitled to discovery and will prove up all liability and damages at the hearing on the Objection to which it is entitled to pursuant to L. Bankr. Rule 3007.

102. Moreover, Relator provided ample factual bases for its Claim. For example, Relator specifically put GDC on notice of the factual underpinnings in the Claim:

> GDC's false representations and certifications relate to (among other things) GDC's financial solvency and ability to perform the Subcontracts; alleged contracts GDC represented it had but did not in connection with obtaining the Subcontracts; failure to disclose approximately $170 million in negative equity related to "loans" from the Saudi Arabian Ministry of Finance; false promises to secure required performance bonds for the Subcontracts; false assurances concerning GDC's technical and engineering experience and capabilities to perform the Subcontracts; GDC's foreign ownership and control, along with the statutory, regulatory and contractual restrictions regarding same; and misappropriation of U.S. Government funds used to complete multiple aircraft owned by GDC's true beneficial and controlling owners – the Saudi Arabian Ministry of Finance. Further, every one of these false claims by GDC was either known or should have been known by Boeing either before unfairly awarding GDC the VC-25B and VC-25A Subcontracts or soon thereafter.[104]

---

[101] *In re Gilbreath*, 395 B.R. 356, 364 (Bankr. S.D. Tex. 2008).
[102] *In re Moreno*, 341 B.R. 813, 818 (Bankr. S.D. Fla. 2006).
[103] *In re Reyna*, 08-10049-CAG, 2008 WL 2961973, at *3.
[104] Claim No. 122.1 ¶ 4.

103.     Any deficiency in the particularity with which Relator describes GDC's role in the fraud is therefore also not a basis for automatic disallowance.[105]

104.     Because the Claim is *prima facie* valid, the Court should overrule GDC's Objection. Alternatively, the Court should overrule GDC's objection on the basis that it seeks the inappropriate remedy of automatic disallowance.

## IV.     DENIAL PURSUANT TO LBR 9014(b)(1) AND FED. R. CIV. P. 8(b)

105.     Rule 8(b) of the Federal Rules of Civil Procedure provides that "[a] party that intends in good faith to deny all the allegations of a pleading . . . may do so by general denial. A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted."

106.     Local Rule 9014 states that "[a] responsive pleading shall specifically admit or deny each factual allegation or state that the party lacks knowledge or information sufficient to form a belief about the truth of an allegation."

107.     Pursuant to Fed. R. Civ. P. 8(b) and L. Rule 9014, Relator hereby makes a general denial as to all of the allegations made by GDC in the Objection, except as follows:

a.   Relator denies the allegations in Paragraph no. 1.

b.   As to Paragraph no. 2, Relator states that requested relief should be denied, and denies the remaining allegations;

c.   As to Paragraph no. 3, Relator admits that this Bankruptcy Court has jurisdiction and venue is proper before this Bankruptcy Court;

d.   As to Paragraph no. 4, admit.

---

[105] *See In re Cloud*, No. 99–51109, 2000 WL 634637, at *2 (5th Cir. 2000) (unpublished); *see also* Fed. R. Bankr. P. 3007, advisory committee's note ("The contested matter initiated by an objection to a claim is governed by rule 9014. . . ."); Fed. R. Bankr. P. 9014, advisory committee's note ("[T]he filing of an objection to a proof of claim . . . creates a dispute which is a contested matter . . . .").

e.  As to Paragraph no. 5, Relator admits that he filed a *qui tam* lawsuit against Boeing, GDC, Dunmire, and MAZ in 2019, and denies the remaining allegations;

f.  As to Paragraph no. 6, Relator denies that there is anything "telling" about the allegations in Paragraph no. 6;

g.  As to Paragraph no. 7, Relator states that there are no allegations to admit or deny, but to the extent otherwise, Relator denies the allegations therein;

h.  Relator admits the allegations in Paragraph nos. 8-10;

i.  As to Paragraph no. 11, Relator states that requested relief should be denied, and denies the remaining allegations;

j.  Relator admits the allegations in Paragraph no. 12.

k.  As to Paragraph no. 13, Relator states that the Claim speaks for itself, and denies the remaining allegations;

l.  As to Paragraph no. 14, Relator states that the Claim speaks for itself, and denies the remaining allegations; and

m.  As to Paragraph no. 15, Relator states that requested relief should be denied, and denies the remaining allegations.

108.    As to any paragraphs not specifically enumerated above, Relator hereby makes a general denial as to each paragraph as if it were set forth separately herein

## V.    **CONCLUSION**

Wherefore, Relator respectfully requests that the Bankruptcy Court enter an order: (i) overruling the Objection; (ii) allowing Relator to amend the Claim as detailed herein; and (iii) granting such other and further relief as the Bankruptcy Court deems just and appropriate under the circumstances.

Dated: October 22, 2021                Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: */s/ Trey Crawford*
**Trey Crawford**
Texas State Bar No. 24059623
tcrawford@cwl.law
**Dave F. Wishnew**
Texas State Bar No. 24052039
dwishnew@cwl.law
**Cameron E. Jean**
Texas State Bar No. 24097883
cjean@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

MUNSCH HARDT KOPF & HARR, P.C.

By: */s/ Thomas Berghman*
**Davor Rukavina,** Tex. Bar No. 24030781
**Thomas D. Berghman,** Tex. Bar No. 24082683
**Julian P. Vasek,** Tex. Bar No. 24070790
500 N. Akard St., Suite 3800
Dallas, TX 75204
Phone: (214) 855-7500
Fax: (214) 855-7584
Email: drukavina@munsch.com
          tberghman@munsch.com
          jvasek@munsch.com


**ATTORNEYS FOR RELATOR
AHMED BASHIR**

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 22, 2021 a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice on the attached service list, via ECF and/or email service.

*/s/ Trey Crawford*
Trey Crawford

## SERVICE LIST

**Debtor**
GDC Technics, LLC
2060 Eagle Pkwy.
Fort Worth, TX 76177

Wick Phillips Gould & Martin, LLP
Attn: Jason M. Rudd
3131 McKinney Ave, Suite 500
Dallas, TX 75204
jason.rudd@wickphillips.com

**Secured Creditor**
Weil, Gotschal & Manges, LLP
Attn: Clifford Carlson & Alfredo Perez
700 Louisiana, Suite 1700
Houston, TX 77002-2784
Alfredo.Perez@weil.com
Clifford.Carlson@weil.com
Gabriel.Morgan@weil.com
Ramsey.Scofield@weil.com

**Parties in Interest**
U.S. Attorney's Office
Attn: Steven Bass
601 NW Loop 410, Suite 600
San Antonio, TX 78216
Steven.Bass@usdoj.gov

MAZAV Management
c/o Waller Lansden Dortsch & Davis, LLP
Attn: Eric Taube & Mark C. Taylor
100 Congress Ave., Suite 1800
Austin, TX 78701

**United States Trustee**
United States Trustee - SA12
USTPRegion07.SN.ECF@usdoj.gov

Office of The United States Trustee
Attn: Shane Tobin
903 San Jacinto Blvd, Room 230
Austin, TX 78701
shane.p.tobin@usdoj.gov

GDC Investco, LP
2021 McKinney Ave., Suite 1200
Dallas, TX 75201
Alfredo.Perez@weil.com
Clifford.Carlson@weil.com
Gabriel.Morgan@weil.com
Ramsey.Scofield@weil.com
Jenae.ward@weil.com

Bexar County
c/o Linebarger Goggan Blair & Sampson LLP
Attn: Don Stecker
112 E. Pecan Street, Suite 2200
San Antonio, TX 78205
sanantonio.bankruptcy@publicans.com

Northwest ISD
c/o Linebarger Goggan Blair & Sampson LLP
Attn: Elizabeth Weller
2777 N. Stemmons Freeway, Suite 1000
Dallas, TX 75207
dallas.bankruptcy@publicans.com

United States of America ex rel. Ahmed Bashir's
Response to Debtor's Objection to Claim No. 122

eric.taube@wallerlaw.com
mark.taylor@wallerlaw.com
trip.nix@wallerlaw.com

Denton County
c/o McCreary Veselka Bragg & Allen, PC
Attn: Tara LeDay
PO Box 1269
Round Rock, TX 78680
tleday@mvbalaw.com

Oracle America, Inc.
c/o Buchalter, a Professional Corporation
Attn: Shawn M. Christianson
55 Second Street, 17th Floor
San Francisco, CA 94105-3493
schristianson@buchalter.com

Dell Financial Services, LLC
Mail Stop-PS2DF-23, One Dell Way
Round Rock, TX 78682
villa@slollp.com

Signature Plating, Ltd.
c/o Law Offices of William B. Kingman, PC
William B. Kingman
3511 Broadway
San Antonio, TX 78209
bkingman@kingmanlaw.com

Texas Comptroller of Public Accounts
Revenue Accounting Division
Attn: Kimberly A. Walsh
Bankruptcy & Collections Division MC 008
PO Box 12548
Austin, TX 78711
kimberly.walsh@oag.texas.gov

Federal Express Corporation
Langley & Banack Inc.
Attn: David S. Gragg
Trinity Plaza II, Suite 700
745 Mulberry
San Antonio, TX 78212

Dell Financial Services, LLC
c/o Streusand Landon Ozburn & Lemmon LLP
Attn: Richard Villa
1801 S. MoPac Expressway, Suite 320
Austin, TX 78746
villa@slollp.com

Cotney Aerospace, LLC
c/o J. Michael McBride, PC
6420 Southwest Blvd., Suite 112
Fort Worth, TX 76109
enotices@mcbridelegal.com

Thinkom Solutions, Inc.
Attn: Matt Turk
4881 West 145th Street
Hawthorne, CA 90250
matt.turk@thinkom.com

Official Committee of Unsecured Creditors
Troutman Pepper Hamilton Sanders, LLP
Attn: Deborah Kovsky-Apap
4000 Town Center, Suite 1800
Southfield, MI 48075
deborah.kovsky@troutman.com
robert.hertzberg@troutman.com

Canon Financial Services, Inc.
Fleischer Fleischer & Suglia, PC
Four Greentree Centre
601 Route 73 N., Suite 305
Marlton, JN 08053
Nsuglia@fleischerlaw.com

Federal Express Corporation
Attn: Michael Siedband
3620 Hack Cross Road, Bldg. B, 3rd Fl
Memphis, TX 38125
michael.siedband@fedex.com

dgragg@langleybanack.com

Weil Gotshal & Manges, LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
jenae.ward@weil.com

Strom Aviation, Inc.
Maris & Lanier, PC
Attn: Robert Maris
12336 Brittany Circle
Dallas, TX 75230
rmaris@marislanier.com

BRG
Attn: Joe Vizzini, Jay Borow, Andrew Cowie
and Josh Denenberg
810 Seventh Avenue, Suite 4100
New York, NY 10019
jvizzini@thinkbrg.com
jborow@thinkbrg.com
acowie@thinkbrg.com
jdenenberg@thinkbrg.com

Tom Kennedy
4568 Tuscany Dr
Plano, TX 75093
tom.kenney@msci.aero

**20 Largest Unsecured Creditors**
Agente Technical, LLC
c/o Dykema Gossett, PLLC
Attn: Patrick Huffstickler
112 E. Pecan Street, Suite 1800
San Antonio, TX 78205
phuffstickler@dykema.com

Aces-Aviation Consulting Experts Inc.
c/o Crown Financial LLC
16420 Park Ten Pl #125
Houston, TX 77084
angie@aviationaces.net

City of Fort Worth

GracoRoberts
The James Firm, PLLC
Attn: Amber L. James
1316 5th Avenue
Fort Worth, TX 76104
amberjames@wtxlaw.com

U.S. Bank National Association
c/o Padfield & Stout, LLP
Attn: Christopher V. Arisco
420 Throckmorton Street, Suite 1210
Fort Worth, TX 76102
carisco@padfieldstout.com
mstout@padfieldstout.com

SierraConstellation Partners
Attn: Carl Moore and Isabella Montani
355 S. Grand Avenue, Suite 1450
Los Angeles, CA 90071
cmoore@scpllc.com
imontani@scpllc.com

SafeWork LLC
Ghidotti Berger Attn: Chase Berger
9720 Coit Road, Suite 220-228
Plano, TX 75025
Bknotifications@ghidottiberger.com

Agente Technical, LLC
714 Centerpark Drive, Suite 140
Colleyville, TX 76034
Bodeneal@agentetech.com

Air Cabin Engineering Inc.
231 W Blueridge Ave
Orange, CA 92865
Markus@aircabin.com

City of Fort Worth

Attn: Leann D. Guzman
200 Texas Street
Fort Worth, TX 76102
sarah.fullenwider@fortworthtexas.gov

Avox Systems, Inc.
225 Erie St
Lancaster, NY 14086
Toni.Brooks@safrangroup.com

Boeing Commercial Airplanes
PO Box 277851
Atlanta, GA 30384-7851
pmgreen@jonesday.com
makairis@jonesday.com
cthatch@jonesday.com
cdipompeo@jonesday.com
rwhamilton@jonesday.com
mccorcoran@jonesday.com

Enflite, Inc.
105 Cooperative Way
Georgetown, TX 78626
kevin@enflite.com

Jormac Aerospace
11221 69th Street North
Largo, FL 33773-5504
Colt.Mehler@jormac.com

Kontron America, Inc.
9477 Waples St., Suite 150
San Diego CA 92121
steve.wingis@us.kontron.com
jenette.carlson@us.kontron.com
ana.torres@us.kontron.com
tim.revers@us.kontron.com

Port Authority of San Antonio
Davidson Troilo Ream & Garza, PC
Attn: Richard E. Hettinger
601 NW Loop 410, Ste. 100
San Antonio, TX 78216-5511
rhettinger@dtrglaw.com

Attn: Christopher B. Mosley
200 Texas Street
Fort Worth, TX 76102
Chris.Mosley@fortworthtexas.gov

B/E Aerospace (Lighting Division)
88269 Expedite Way
Chicago, IL 60695-0001
eric.beverage@collins.com

Transtar Aircraft Interiors, LLC
c/o Jackson Walker, LLP
Attn: Michael S. Held & J. Machir Stull
2323 Ross Ave., Suite 600
Dallas, TX 75201
mheld@jw.com
mstull@jw.com

Delta Air Lines, Inc.
Legal Dept 981
1030 Delta Blvd.
Atlanta, GA 30354
david.cartee@delta.com

Goodrich Cabin Systems-Booth Veneers
PO Box 846118
Dallas, TX 75284-6118
mike.cundiff@collins.com

KLDiscovery Ontrack, LLC
Attn: Shea Orlando
8201 Greensboro Dr, Suite 300
McLean, VA 22102
shea.orlando@kldiscovery.com

Pac Seating Systems Inc.
3370 SW 42nd Ave.
Palm City, FL 34990
Eidson@pac-fl.com

Satcom Direct Avionics, ULC

The Boeing Company
Jones Day Attn: Paul M. Green
717 Texas, Suite 3300
Houston, TX 77002
pmgreen@jonesday.com
hlennox@jonesday.com
ozeltner@jonesday.com

Transtar Aircraft Interiors, LLC
1184 Corporate Dr. W, Suite A
Arlington, TX 76006
danny.wintz@dfwaircraft.com

Weaver and Tidwell, LLP
Attn: Frank McElroy
24 Greenway Plaza, Suite 1800
Houston, TX 77046
frank.mcelroy@weaver.com

Cedar Business Services
Attn: Oscar Islas
5230 Las Virgenes Rd, Suite 210
Calabasas, CA 91302
Oscar.islas@cedarsbiz.com

Vinson & Elkins LLP
Attn: William Wallander and Kristie Duchesne
Trammell Crow Center
2001 Ross Ave., Ste. 3900
Dallas, TX 75201
bwallander@velaw.com
kduchesne@velaw.com